Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jake@blockleviton.com

Attorneys for Plaintiff Charles Larry Crews, Jr.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES LARRY CREWS, JR., Individually and on Behalf of All Others Similarly Situated, | Case No._____ |
| Plaintiff, | |
| vs. | **CLASS ACTION** |
| RIVIAN AUTOMOTIVE, INC., ROBERT J. SCARINGE, CLAIRE MCDONOUGH, JEFFREY R. BAKER, KAREN BOONE, SANFORD SCHWARTZ, ROSE MARCARIO, PETER KRAWIEC, JAY FLATLEY, PAMELA THOMAS-GRAHAM, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO., LLC, J.P. MORGAN SECURITIES LLC, BARCLAYS CAPITAL INC., DEUTSCHE BANK SECURITIES INC., ALLEN & COMPANY LLC, BofA SECURITIES, INC., MIZUHO SECURITIES USA LLC, WELLS FARGO SECURITIES, LLC, NOMURA SECURITIES INTERNATIONAL, INC., PIPER SANDLER & CO., RBC CAPITAL MARKETS, LLC, ROBERT W. BAIRD & CO. INC., WEDBUSH SECURITIES INC., ACADEMY SECURITIES, INC., BLAYLOCK VAN, LLC, CABRERA CAPITAL MARKETS LLC, C.L. KING & ASSOCIATES, INC., LOOP CAPITAL MARKETS LLC, SAMUEL A. RAMIREZ & CO., INC., SIEBERT WILLIAMS SHANK & CO., LLC, and TIGRESS FINANCIAL PARTNERS LLC, | **COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| | |
| | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

1. Plaintiff Charles Larry Crews, Jr. ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Rivian Automotive, Inc. ("Rivian" or "the Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**INTRODUCTION**

2. Plaintiff, on behalf of the Class, brings claims against all Defendants for violations of Section 11 of the Securities Act of 1933 (the "Securities Act").

3. The issuance of Rivian common stock in connection with the initial public offering ("IPO" or "Offering") was registered under the Securities Act of 1933, as amended, pursuant to Rivian's registration statement on Form S-1 (File No. 333-259992) declared effective on November 9, 2021 (the "Registration Statement"). This case arises from untrue statements of material fact as well as the omission of other facts necessary in order to make statements contained in the Registration Statement not materially false or misleading.

4. Rivian is an electric vehicle ("EV") company that purports to design, develop, and manufacture category-defining electric vehicles and accessories and sell them directly to customers in the consumer and commercial markets.

5. In 2018, Rivian unveiled its first consumer EVs: the R1T electric pickup truck and the R1S electric SUV. According to the Registration Statement, the "R1T and R1S introduce our brand to the world and will serve as our flagship vehicles as we continue to expand our offerings."

6.     R1T sales began in September 2021 and R1S sales were planned to begin in December 2021. As of October 31, 2021, Rivian reported "approximately 55,400 R1T and R1S preorders in the United States and Canada from customers who paid a cancellable and fully refundable deposit of $1,000." At the time of its IPO, Rivian planned to produce approximately 1,200 R1Ts and 25 R1Ss by the end of 2021. Based on Rivian's production forecast, the Company expected to fill its 55,400 R1T and R1S backlog by the end of 2023. Thus, while the number of preorders underscored Rivian's potential for success – that potential depended on customers ultimately completing their purchases once Rivian's EVs became available.

7.     On November 10, 2021, Rivian offered 153 million shares to the public through an IPO at a price of $78.00 per share for total proceeds of $11.93 billion.

8.     Rivian's focus on its reputation for transparency and devotion to its customers, along with Rivian's R1T and R1S, including the large number of preorders and potential for increased demand were key selling points to IPO investors.

9.     Unbeknownst to investors, however, the Registration Statement's representations were materially inaccurate, misleading, and/or incomplete because they failed to disclose, among other things, that the R1T and R1S were underpriced to such a degree that Rivian would have to raise prices shortly after the IPO and that these price increases would tarnish Rivian's reputation as a trustworthy and transparent company and would put a significant number of the existing backlog of 55,400 preorders along with future preorders in jeopardy of cancellation.

10.     Accordingly, the price of the Company's shares was artificially and materially inflated at the time of the Offering.

11.     On the date of filing this complaint, Rivian shares closed at $42.43 per share, significantly below their $78.00 IPO price.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                                    3

12.     By this action, Plaintiff, on behalf of himself and other Class Members who also acquired the Company's shares pursuant or traceable to the Offering, now seeks to obtain a recovery for the damages suffered as a result of Defendants' violations of the Securities Act, as alleged herein.

13.     The claims asserted herein are purely strict liability and negligence claims. Plaintiff expressly eschews any allegation sounding in fraud.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under § 11 of the 1933 Act (15 U.S.C. §77k).

15.     Jurisdiction is conferred by 28 U.S.C. § 1331 and § 22 of the Securities Act.

16.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and § 22 of the Securities Act as certain of the Defendants reside, are headquartered, and/or maintain operations, in this District. Defendants' wrongful acts also arose in and emanated from, in part, this District, including the dissemination of materially misleading statements into this District and the purchase of the Company's common stock by members of the Class (defined herein) who reside in this District.

17.     In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### A. Plaintiff

18.     Plaintiff purchased 35 shares of the Company's common stock on November 10, 2021, at a price of $112.83 per share. These shares were issued pursuant and traceable to the Registration Statement and Offering, and Plaintiff was damaged thereby.

**B. Defendants**

19.     Defendant Rivian is an electric vehicle company based in Irvine, California. Rivian's shares are listed and trade on the NASDAQ under the ticker "RIVN." Rivian designs, develops, and manufactures EVs and accessories and sells them directly to consumers.

20.     At the time of the IPO, Defendant Robert J. Scaringe, who founded the Company, was serving as Chief Executive Officer and as Chairman of Rivian's Board of Directors (the "Board"). Defendant Scaringe participated in the preparation of and signed the Registration Statement.

21.     At the time of the IPO, Defendant Claire McDonough was serving as Chief Financial Officer. Defendant McDonough participated in the preparation of and signed the Registration Statement.

22.     At the time of the IPO, Defendant Jeffrey R. Baker was serving as Chief Accounting Officer. Defendant Baker participated in the preparation of and signed the Registration Statement.

23.     At the time of the IPO, Defendant Karen Boone was serving as a director on the Rivian Board. Defendant Boone participated in the preparation of and signed the Registration Statement.

24.     At the time of the IPO, Defendant Sanford Schwartz was a director on the Rivian Board. Defendant Schwartz participated in the preparation of and signed the Registration Statement.

25.     At the time of the IPO, Defendant Rose Marcario was a director on the Rivian Board. Defendant Marcario participated in the preparation of and signed the Registration Statement.

26. At the time of the IPO, Defendant Peter Krawiec was a director on the Rivian Board. Defendant Krawiec participated in the preparation of and signed the Registration Statement.

27. At the time of the IPO, Defendant Jay Flatley was a director on the Rivian Board. Defendant Flatley participated in the preparation of and signed the Registration Statement.

28. At the time of the IPO, Defendant Pamela Thomas-Graham was a director on the Rivian Board. Defendant Thomas-Graham participated in the preparation of and signed the Registration Statement.

29. Defendants Scaringe, McDonough, Baker, Boone, Schwartz, Marcario, Krawiec, Flatley, and Thomas-Graham are collectively referred to herein as the "Individual Defendants."

30. The following underwriters were also instrumental in soliciting and making the stock offered in the IPO available to the investing public:

| Name | Number of Shares |
|---|---|
| Morgan Stanley & Co. LLC | 38,898,305 |
| Goldman Sachs & Co. LLC | 38,898,305 |
| J.P. Morgan Securities LLC | 32,415,254 |
| Barclays Capital Inc. | 7,331,250 |
| Deutsche Bank Securities Inc. | 7,331,250 |
| Allen & Company LLC | 9,319,386 |
| BofA Securities, Inc. | 4,143,750 |
| Mizuho Securities USA LLC | 4,143,750 |
| Wells Fargo Securities, LLC | 4,143,750 |
| Nomura Securities International, Inc. | 1,275,000 |
| Piper Sandler & Co. | 1,275,000 |
| RBC Capital Markets, LLC | 1,275,000 |
| Robert W. Baird & Co. Incorporated | 637,500 |
| Wedbush Securities Inc. | 637,500 |
| Academy Securities, Inc. | 159,375 |
| Blaylock Van, LLC | 159,375 |
| Cabrera Capital Markets LLC | 159,375 |
| C.L. King & Associates, Inc. | 159,375 |

| | |
|---|---|
| Loop Capital Markets LLC | 159,375 |
| Samuel A. Ramirez & Company, Inc. | 159,375 |
| Siebert Williams Shank & Co., LLC | 159,375 |
| Tigress Financial Partners, LLC | 159,375 |

31. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Morgan Stanley acted as a representative of all the underwriters. Morgan Stanley also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Morgan Stanley's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Morgan Stanley conducts business in the State of California.

32. Defendant Goldman Sachs & Co. LLC ("Goldman") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Goldman acted as a representative of all the underwriters. Goldman also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Goldman's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Goldman conducts business in the State of California.

33. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. J.P. Morgan acted as a representative of all the underwriters. J.P. Morgan also participated in

conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. J.P. Morgan's participation in the solicitation of the Offering was motivated by its financial interests. Defendant J.P. Morgan conducts business in the State of California.

34.     Defendant Barclays Capital Inc. ("Barclays") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Barclays also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Barclays' participation in the solicitation of the Offering was motivated by its financial interests. Defendant Barclays conducts business in the State of California.

35.     Defendant Deutsche Bank Securities Inc. ("Deutsche") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Deutsche also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Deutsche's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Deutsche conducts business in the State of California.

36.     Defendant Allen & Company LLC ("Allen") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Allen also participated

in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Allen's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Allen conducts business in the State of California.

37.    Defendant BofA Securities, Inc. ("BofA") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. BofA also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. BofA's participation in the solicitation of the Offering was motivated by its financial interests. Defendant BofA conducts business in the State of California.

38.    Defendant Mizuho Securities USA LLC ("Mizuho") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Mizuho also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Mizuho's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Mizuho conducts business in the State of California.

39.    Defendant Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Wells Fargo also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including

lodging and travel, among other expenses. Well Fargo's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Wells Fargo conducts business in the State of California.

40.     Defendant Nomura Securities International, Inc. ("Nomura") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Nomura also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Nomura's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Nomura conducts business in the State of California.

41.     Defendant Piper Sandler & Co. ("Piper Sandler") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Piper Sandler also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Piper Sandler's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Piper Sandler conducts business in the State of California.

42.     Defendant RBC Capital Markets, LLC ("RBC") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. RBC also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and

travel, among other expenses. RBC's participation in the solicitation of the Offering was motivated by its financial interests. Defendant RBC conducts business in the State of California.

43.   Defendant Robert W. Baird & Co. ("Baird") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Baird also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Baird's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Baird conducts business in the State of California.

44.   Defendant Wedbush Securities Inc. ("Wedbush") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Wedbush also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Wedbush's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Wedbush conducts business in the State of California.

45.   Defendant Academy Securities, Inc. ("Academy") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Academy also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Academy's participation in the solicitation of the Offering was

motivated by its financial interests. Defendant Academy conducts business in the State of California.

46.    Defendant Blaylock Van, LLC ("Blaylock") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Blaylock also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Blaylock's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Blaylock conducts business in the State of California.

47.    Defendant Cabrera Capital Markets LLC ("Cabrera") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Cabrera also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses Cabrera's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Cabrera conducts business in the State of California.

48.    Defendant C.L. King & Associates, Inc. ("C.L. King") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. C.L. King also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. C.L. King's participation in the solicitation of the Offering was

motivated by its financial interests. Defendant C.L. King conducts business in the State of California.

49.     Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Loop Capital also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Loop Capital's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Loop Capital conducts business in the State of California.

50.     Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Ramirez also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Ramirez's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Ramirez conducts business in the State of California.

51.     Defendant Siebert Williams Shank & Co., L.L.C ("Siebert") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Siebert also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging

and travel, among other expenses. Siebert's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Siebert conducts business in the State of California.

52.     Defendant Tigress Financial Partners, LLC ("Tigress") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Tigress also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Tigress's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Tigress conducts business in the State of California.

53.     The Defendants in paragraphs 31-52 are collectively referred to herein as the "Underwriter Defendants." Rivian, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as the "Defendants."

54.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Offering's Registration Statement and Prospectus. The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

55.     The Underwriter Defendants are primarily investment banking houses that specialize, among other things, in underwriting public offerings of securities. As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the Offering.

56.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material

information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

57.     Representatives of the Underwriter Defendants also assisted the Company and Individual Defendants in planning the Offering. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

58.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants should have known of the Company's undisclosed existing problems and plans and the material misstatements and omissions contained in the Registration Statement, as detailed herein.

59.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales of the Company's shares pursuant and/or traceable to the Offering and relevant offering materials, including to Plaintiff and the Class.

**Substantive Allegations**

60.     The Registration Statement and Prospectus used to effectuate Rivian's IPO contained untrue statements of material fact, and omitted information necessary in order to make the statements made therein not misleading, and omitted material facts required to be stated therein. Specifically, the Registration Statement misled investors with respect to the potential for significant reputational damage and cancellation of fully refundable preorders for its R1T and R1S EVs due to the Company's need to address its underpriced EVs by raising prices shortly after the IPO.

61.     As a new entrant into the automotive industry, the Registration Statement acknowledged that Rivian faced the challenge of competing against current and potential manufacturers for sales:

> Both the automobile industry generally, and the EV segment in particular, are highly competitive, and we will be competing for sales with both EV manufacturers and traditional automotive companies. Many of our current and potential competitors may have significantly greater financial, technical, manufacturing, marketing, or other resources than we do and may be able to devote greater resources to the design, development, manufacturing, distribution, promotion, sale and support of their products than we may devote to our products. We expect competition for EVs to intensify due to increased demand and a regulatory push for alternative fuel vehicles, continuing globalization, and consolidation in the worldwide automotive industry

62.     Indeed, at the time of its IPO, Rivian was just beginning to produce and deliver its first consumer EVs. As stated in the Registration Statement:

> In the consumer market, we launched the R1 platform with our first-generation consumer vehicle, the R1T, a two-row five-passenger pickup truck, and began making customer deliveries in September 2021. As of September 30, 2021, we produced 12 R1Ts and delivered 11 R1Ts, and as of October 31, 2021, we produced 180 R1Ts and delivered 156 R1Ts. Nearly all of these vehicles were delivered to Rivian employees, and we expect to ramp deliveries to third-party customers as we increase our production rate. We plan to launch and commence customer deliveries for the R1S, a three-row seven-passenger sports utility vehicle ("SUV") in December 2021 following the completion of ongoing vehicle validation and all required testing. By the end of 2021, we intend to produce approximately 1,200 R1Ts and 25 R1Ss and deliver approximately 1,000 R1Ts and 15 R1Ss.

63.     Accordingly, Rivian's ability to achieve success would depend on building a strong brand that encouraged adoption and customer loyalty. Despite its status as newcomer to the industry, Rivian enjoyed a great deal of excitement in the lead up to its IPO. An article published in *The Wall Street Journal* on November 9, 2021, noted that Rivian's IPO was "highly anticipated" and that:

> On its roadshow pitch to investors, Rivian's bankers compared the company to electric-vehicle giant Tesla Inc., whose explosive share increase has handed it a market capitalization of more than $1 trillion. Though Rivian is at a much earlier stage, has big losses and had no revenue until very recently, investors were clearly receptive and drawn to the company's growth potential.

64.     To that end, the Registration Statement made the following representations concerning Rivian's business and potential for growth:

> Our diverse product portfolio and focus on inspiring people to get out and explore the world positions us to build an enduring brand while addressing a wide range of future mobility and sustainability solutions. Through our base of preorders, we observe strong affinity for our brand which we expect to intensify as brand awareness grows and we welcome new customers to the Rivian community. As of October 31, 2021, we had approximately 55,400 R1T and R1S preorders in the United States and Canada from customers who each paid a cancellable and fully refundable deposit of $1,000. We believe the combination of our deep focus on addressing climate change, building compelling products, and delivering a superior customer experience will enable Rivian to drive adoption and customer loyalty, powering our continued growth.

65.     The Registration Statement highlighted factors that would contribute to the Company's success, including its direct customer relationships:

**The Rivian Advantage**

> We designed all aspects of our ecosystem, business model, offerings, and organization to enable a scalable, customer-centric, and efficient approach, resulting in key competitive advantages.

                            *        *        *

- *Direct Customer Relationships.* We are a customer-centric organization. Our direct relationships with customers allow us to design solutions that best serve their needs, drive strong engagement, remove structural inefficiencies, create transparency, and increase customer satisfaction and referrals. Our relationships also serve as a medium for establishing a real-time feedback loop, through which we gather valuable data to improve our products and services. By controlling every customer touchpoint from awareness through ownership, we replace a patchwork of third parties with our end-to-end, integrated solutions. We expect to deliver more value

to customers along with a superior experience that will generate brand loyalty and increase adoption of our offerings.

66.     The Registration Statement emphasized that "Our first production vehicles, the R1T [and] R1S, . . . are our handshake with the world, the first step in building a relationship with customers. We are focused on ensuring that this first experience with a Rivian vehicle creates excitement and passion for our brand."

67.     Similarly, the Registration Statement stated that "Our vehicles occupy an attractive whitespace, addressing large, fast-growing, and high-margin market segments, and are designed to accelerate the large-scale adoption of sustainable transportation. The R1T and R1S introduce our brand to the world and will serve as our flagship vehicles as we continue to expand our offerings."

68.     The Registration Statement reaffirmed these representations by making the following statements concerning Rivian's focus on consumer experience:

**The Rivian Consumer Experience**

Our consumer journey has been holistically designed to create a seamless, end-to-end experience across the vehicle lifecycle, including awareness, engagement, conversion, delivery, and ownership. As part of this journey, we have developed intuitive digital tools and robust infrastructure to deliver an exceptional experience.

Every aspect of our brand has been developed and is being managed in-house to ensure we create a unique consumer journey that is difficult to replicate. Each step builds on the other, forming a completely integrated and seamless experience for our owners.

*       *       *

*Awareness*

We generate awareness without sacrificing authenticity. The Rivian brand keeps an honest, approachable, transparent tone and is designed around adventure. We have built our brand and its expressions in-house, spanning creative, marketing, design, digital development, content production, events planning, and analytics. No agencies of record. No paid media. We rely on both shared and earned media to connect directly with our community through engaging content, rich digital experiences, and immersive events. Building awareness organically creates deeper bonds with our community and draws even more people in.

*Engagement*

Every consumer interaction comes directly from Rivian; whether it is attending an event, subscribing to our digital content, or purchasing one of our vehicles. We do not rely on third parties or franchisees to engage with our consumers. This one-to-one connection starts at the earliest stages of our relationship, allowing us to form stronger bonds and more deeply understand our consumer. The centerpiece of our engagement approach is our comprehensive demo drive program. Traveling tour events in high-growth regions offer immersive driving experiences while forming connections with our community. To complement our touring drive events, we will also offer at-home drive experiences where we will bring vehicles to individual consumers for a truly personalized, curated experience. By designing our experiences entirely around our consumers we seek to create connection and trust, and a compelling case to move to the next step in the journey with us.

### *Conversion*

We have made buying a Rivian vehicle simple, transparent, and easy. There are no dealers to visit or complex, high-pressure sales tactics to endure. We have removed the uncomfortable haggling and unfair leverage typically encountered in the traditional dealership model. Our intuitive online ordering process replaces what otherwise requires several hours at a dealership, with a stress-free experience you can manage in minutes from your couch. Should an issue arise, every consumer has a dedicated Rivian Guide they can call, text, or email directly for help. If a consumer isn't satisfied, we offer the assurance of a hassle-free 7-Day, 1,000-Mile Return Policy. Removing barriers to purchase with helpful, proactive, frictionless shopping tools and customer service results in more willingness to try our brand, including our vehicles, accessories, services, and merchandise.

69.    The Registration Statement also addressed the need to attract and retain a large

number of customers:

Our success depends on attracting a large number of potential customers to purchase our vehicles and the associated services we will provide to our customers. As of October 31, 2021, we had accepted preorders for approximately 55,400 R1Ts and R1Ss in the United States and Canada. Preorders are not commitments to purchase our R1T or R1S and are subject to cancellation by customers. If our existing preorder and prospective customers do not perceive our vehicles and services to be of sufficiently high value and quality, cost competitive and appealing in aesthetics or performance, or if the final production version of the R1S is not sufficiently similar to the drivable design prototypes, we may not be able to retain our current preorder customers or attract new customers, and our business, prospects, financial condition, results of operations, and cash flows would suffer as a result.

70.    As to nature of Rivian's preorders, the Registration Statement explained:

Deliveries of the R1T began in September 2021 and deliveries of the R1S are not expected to begin until December 2021, and may occur later or not at all. As a result, we offer waitlist preorders for consumers with a cancellable and fully refundable deposit of $1,000. Deposits paid to preorder the R1T and R1S are cancellable by the customer until the customer enters into a lease or purchase agreement. Because all of our preorders are cancellable, it is possible that a

significant number of customers who submitted preorders for our vehicles may not purchase vehicles.

The potentially long wait from the time a preorder is made until the time the vehicle is delivered, and any delays beyond expected wait times, could also impact customer decisions on whether to ultimately make a purchase. Any cancellations could harm our business, prospects, financial condition, results of operations, and cash flows.

71.     Prior to the IPO, Rivian originally announced base pricing for its R1T pickup truck and R1S SUV at $69,000 and $72,000, respectively. In December of 2019, Tesla unveiled its Cybertruck with a base price of $39,900. In a January 26, 2020 article published on the website *Electek* titled "Rivian will start under expected $69,000 price – Cybertruck effect in action?" it was reported that Rivian adjusted its pricing to compete with Tesla.[1] According to the article, "Rivian now says that $69,000 will be the price for a 'well-equipped vehicle,' and that base model pricing will actually be lower than that." The article noted that after federal tax credits for EVs (which Tesla no longer qualified for), "a new base model Rivian could net out to less than $50,000 all-told. This would be quite impressive and even more disruptive than we originally thought."

72.     The Registration Statement failed to inform investors that it had underpriced the R1T and R1S to such a degree that Rivian would be forced to raise prices shortly after the IPO. As a result, the statements identified in paragraphs 61-62 and 64-70, were materially inaccurate, misleading, and/or incomplete because they failed to disclose the potential for significant reputational damage and cancellation of fully refundable preorders for the R1T and R1S that would result from Rivian's need to address its underpriced EVs by raising prices shortly after the IPO.

73.     For the foregoing reasons, in addition to being untrue and misleading because of affirmative untrue and misleading statements and omissions, Rivian's Registration Statement also

---

[1] https://electrek.co/2020/01/26/rivian-base-price-lower-than-69000-cybertruck-effect/

failed to comply with SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"). Item 303 required Rivian to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

74.    Rivian violation Item 303 by failing to disclose the risk of reputational damage and preorder cancellations related to the Company's need to raise prices on the R1T and R1S.

75.    The true facts regarding the Offering Documents emerged after news broke that Rivian was raising its prices. On March 1, 2022, Rivian announced that it was raising the prices of its R1T pickup and R1S SUV by 17 percent and 20 percent, respectively, and that the new prices would apply to nearly all preorders. At the time of the announcement, Rivian had only produced and sold roughly 1,000 vehicles. Meanwhile, the number of preorders for the R1T and R1S had grown to approximately 71,000 as of December 15, 2021.

76.    In a statement to *Electrek*, Rivian's chief growth officer, Jiten Behl, attributed the price increases to inflation and the fact that the prices were originally set in 2018:

> Like most manufacturers, Rivian is being confronted with inflationary pressure, increasing component costs, and unprecedented supply chain shortages and delays for parts (including semiconductor chips). This rise in cost and complexity due to these challenging circumstances necessitate an increase to the prices of the R1T and R1S models we offer today — prices which were originally set in 2018. This decision will allow us to continue to offer competitive products that maintain the high standard of quality, performance and capabilities that our customers expect and deserve from Rivian. Along with the adjusted prices for our current offerings, we are also announcing Dual-Motor AWD and Standard battery pack options for R1T and R1S, which will provide a broader range of choices for customers as part of our expanding portfolio of options, upgrades and accessories.[2]

---

[2] *See* https://electrek.co/2022/03/01/rivian-prices-increases-many-electric-pickup/

77.     However, as discussed in paragraph 71 above, in response to Tesla's unveiling of its Cybertruck, Rivian announced in 2020 that the pricing for the R1T and R1S was actually for a "well-equipped vehicle" and that the base model pricing would be lower.

78.     Moreover, a March 2, 2022 article in the online publication *ARS Technica*, titled "Rivian surprises, outrages EV truck buyers with 20% price hike," questioned the reasons behind the price increases. The article stated, in part, "While inflation is likely part of the story, the price hike may have been planned for a while. In a lawsuit filed by Laura Schwab, the company's former VP of sales and marketing who alleges the company has a 'toxic' bro culture,' concerns over profitability were raised in spring 2021." The article quotes from the lawsuit, which was filed in the Superior Court of California for Orange County, on November 4, 2021, just days before the IPO, as follows:

> Beginning in spring of 2021, Ms. Schwab started to raise the alarm about concerns she had relating to Rivian's ability to deliver on its promises to investors. Shockingly, Mr. Behl dismissed her concerns and explicitly asked Ms. Schwab not to raise these issues in front of Mr. [RJ] Scaringe [Rivian's CEO].

> First, it was clear that the vehicles were underpriced, and each sale would result in a loss for the company. Ms. Schwab ultimately contacted Dennis Lucey, Rivian's Finance Director, and worked with him to develop projections showing how much of a loss the company would incur if Rivian did not raise prices. Ms. Schwab raised this issue with several executives, including Mr. Behl, Stuart Dixon (Director of Product Management), and Andy Zicheck (Principal Product Manager). Mr. Behl brushed her off. Eventually, Mr. [Patrick] Hunt [then-senior director of consumer digital] raised the issue with Mr. Behl, at which point Mr. Behl agreed that they would need to raise the vehicle prices after the IPO.[3]

79.     Customers who had placed $1,000 refundable deposits for Rivian's vehicles configured to their individual preferences were understandably furious. Online Rivian forums, social media, and news publications were rife with examples of outrage toward Rivian. One poster

---

[3] *See* https://arstechnica.com/cars/2022/03/rivian-surprises-outrages-ev-truck-buyers-with-20-price-hike/

on Rivian's Owner Forum wrote "I'm out. Terrible way to treat early adopters."[4] Another

individual commented:

> My quoted price previously was $78,820 for an R1S after going through the configurator to get the same vehicle it's $92k. ***A 17k increase is not inflation – it means it wasn't priced appropriately to begin with***. Add-in the new 'option' for a dual motor which is position as a great new option but in reality it just means they are now charging you more for the quad motor which was previously the only option. ***This feels like a gigantic bait and switch***. I may be losing interest at this point as well… (emphases added).[5]

80.     An article published in *Electrek* on March 2, 2022, titled "Rivian buyers are

cancelling at alarming rates after price increases," noted that "A poll on the Rivian subreddit, one

of the biggest communities of Rivian fans, gives us a better idea of the pulse of the reservation

holders, and it shows a high cancelation rate" and provided a screenshot of the poll, which showed

a majority of voters planned to cancel their reservations[6]:



[4] *See* https://www.rivianforums.com/forum/threads/r1t-r1s-updated-pricing-configuration-specs-dual-motor-now-available.3712/page-4#post-102860

[5] *See* https://www.rivianownersforum.com/threads/new-email-just-received-important-r1s-pricing-and-product-information.2418/post-22915

[6] *See https://electrek.co/2022/03/02/rivian-buyers-canceling-alarming-rate-after-price-increases/*

81.     Reservation holders also expressed their anger toward Rivian by posting screen shots of their preorder cancellations to reddit and other social media platforms. As an example, a reddit user posted the following screen shot under the heading "Another Long Term Supporter Cancelling":



82.     By the close of trading on March 1, 2022, Rivian's share price had fallen to $61.91 per share, down $5.65 per share from the previous day's close of $67.56 per share. Rivian shares plummeted further the following day, closing at $53.56 per share on March 2, 2022.

83.     In a futile attempt at damage control, Rivian's CEO issued a letter on March 3, 2022, apologizing to customers for breaking their trust and walking back the price increases by stating that the Company would honor original prices for preorders placed prior to the price increase announcement. In the letter, Defendant Scaringe wrote that "Earlier this week, we announced pricing increases that broke the trust we have worked to build with you[,]" and "The most important aspect of what we are building is our relationship with all of you. As we demonstrated earlier this week, trust is hard to build and easy to break."

84.     Despite agreeing to honor original pricing for existing preorders and allowing customers who cancelled to reinstate their orders, the damage to Rivian's reputation was already done. A March 3, 2022 article in *The Wall Street Journal* titled "EV Startup Rivian Walks Back Price Increase, Apologizes to Customers," shared the following from a now-former Rivian customer:

> Paul Morgan, 39-year-old California resident, expected Rivian's prices to go up a couple thousand dollars to account for inflation. When he received notice that the price on his preordered Rivian SUV would increase $19,000, he drew the line.
>
> "Within five seconds of seeing the new price I clicked the cancel button," Mr. Morgan said. Even after learning that his original price would be honored, he said he didn't reinstate his order.[7]

85.     Rivian's stock fell an additional $2.65 per share on March 3, 2022, and continued to fall to $42.43 per share on March 7, 2022, the date of this complaint – down 37% from the February 28, 2022 closing price of $67.56 per share and significantly below Rivian's IPO price of $78.00 per share.

---

[7] *See* https://www.wsj.com/articles/electric-vehicle-startup-rivian-walks-back-price-increase-apologizes-to-customers-11646321716

1

## CLASS ACTION ALLEGATIONS

2

86.    Plaintiff brings this action individually and as a class action on behalf of all persons

3

or entities other than Defendants who purchased Rivian's common stock pursuant to or traceable

4

to Rivian's Initial Public Offering (the "IPO") on November 10, 2021.

5

6

87.    This action is properly maintainable as a class action.

7

88.    The Class is so numerous that joinder of all members is impracticable.  Millions of

8

shares were sold by Rivian in the IPO. Consequently, the number of Class members is believed to

9

be in the thousands and are likely scattered across the United States. Moreover, damages suffered

10

by individual Class members may be small, making it overly expensive and burdensome for

11

individual Class members to pursue redress on their own.

12

13

89.    There are questions of law and fact that are common to the Class and that

14

predominate over questions affecting any individual Class member. The common questions

15

include, inter alia:

16

　　　a.  whether the Registration Statement contained untrue statements of material

17

　　　　　fact;

18

19

　　　b.  whether the Individual Defendants signed the Registration Statement; and

20

　　　c.  whether the Underwriter Defendants acted as underwriters.

21

90.    Plaintiff's claims are typical of the claims of the other members of the Class and

22

Plaintiff does not have any interests adverse to the Class.

23

91.    Plaintiff is an adequate representative of the Class, has retained competent counsel

24

experienced in litigation of this nature, and will fairly and adequately protect the interests of the

25

Class.

26

92.    The prosecution of separate actions by individual members of the Class would

27

28

create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

93.     There will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

94.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## <u>COUNT ONE</u>

### **VIOLATION OF SECTION 11 OF THE SECURITIES ACT**
### **AGAINST ALL DEFENDANTS**

95.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

96.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

97.     The Company is the issuer of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the untrue statements of material facts contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

98.     The Individual Defendants each signed the Registration Statement or authorized the signing of the Registration Statement on their behalf.

99.     The Underwriter Defendants each served as underwriters in connection with the Offering.

100.    By reason of the conduct herein alleged, each Defendant named herein violated Section 11 of the Securities Act.

101.    Plaintiff acquired Rivian common stock pursuant or traceable to the Registration Statement used for the IPO, and without knowledge of the material omissions or misrepresentations alleged herein.

102.    Plaintiff and the Class have sustained damages because they purchased Rivian stock at an inflated price, which declined in value as a result of the corrective disclosures detailed herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants as follows:

1.    Ordering that this action may be maintained as a class action and certifying Plaintiff as Class representatives and their counsel as Class counsel for actual damages and such other relief as the court deems appropriate;

2.    For pre-judgment and post-judgment interest on any such monetary relief;

3.    For reasonable attorneys' fees and costs;

4.    For costs of suit herein; and

5.    For such further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury on all counts so triable.

March 7, 2022                                              **BLOCK & LEVITON LLP**

                                                          /s/ Jacob A. Walker
                                                          Jacob A. Walker (CA Bar No. 271217)
                                                          260 Franklin Street, Suite 1860
                                                          Boston, MA 02110
                                                          (617) 398-5600 phone
                                                          jake@blockleviton.com

                                                          *Counsel for Plaintiff*

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                              28